Present: Carrico, C.J., Compton, Stephenson, Lacy, Hassell, and
Keenan, JJ., and Whiting, Senior Justice

THE STENRICH GROUP, ET AL.

v. Record No. 950829

CLAUDIA H. JEMMOTT


PERDUE FARMS, INC.
                                            OPINION BY
v. Record No. 951050         CHIEF JUSTICE HARRY L. CARRICO
                                          March 1, 1996
LINDA KAY MARTIN


WAMPLER-LONGACRE CHICKEN, INC., ET AL.

v. Record No. 951072

SHIRLEY A. BILLER

            FROM THE COURT OF APPEALS OF VIRGINIA


     The dispositive question in each of these cases is whether

the Workers' Compensation Commission (the Commission) and the

Court of Appeals erred in finding that a job-related physical

impairment resulting from cumulative trauma caused by repetitive

motion is a disease within the contemplation of the Workers'

Compensation Act (the Act). The question arises in the context

of the following factual and procedural scenarios:

                        Stenrich v. Jemmott

     On August 1, 1989, Claudia H. Jemmott (Jemmott) began

working for The Stenrich Group, Inc. (Stenrich), a Richmond

advertising concern, as a copy editor/proofreader, later becoming

a senior copy editor/proofreader. She spent between five and six

hours of each workday using a pen and a "slant board" in the

performance of her duties, with her hands moving repetitively

"back and forth and downward" as she read and corrected written material.

On March 13, 1992, Jemmott experienced "an intense burning sensation" in her right hand. Thereafter, she tended to rely more upon her left hand, but it also began to cause her discomfort. In August 1992, she came under the care of Dr. Bruce M. Stelmack. He diagnosed her as suffering from carpal tunnel syndrome in both hands, which he attributed to the repetitive motions involved in her work. These motions, the doctor stated in a deposition submitted to the Commission, caused Jemmott "micro trauma," meaning "a small amount of injury in a repetitive motion to the same area . . . occur[ring] in patients [who] flex their wrist and impinge the nerve as it courses through the carpal tunnel." The doctor opined that carpal tunnel syndrome is "a disease process" as distinguished from "a simple injury."

Deputy Commissioner Lee entered an award of compensation in favor of Jemmott. Affirming the award, the full Commission wrote as follows:

> Dr. Stelmack testified convincingly that [Jemmott] has a disease, which he distinguishes from an injury. Dr. Stelmack stated that repetitive use of [Jemmott's] hands resulted in repetitive trauma but he also stated that this repetitive use resulted in a disease process. We find, therefore, that [Jemmott's] carpal tunnel syndrome is a disease.

### Perdue Farms v. Martin

On June 12, 1990, Linda Kay Martin (Martin) began working for Perdue Farms, Inc. (Perdue) as a sanitation worker at its chicken processing plant in Bridgewater. For approximately 5-1/2 hours each day, Martin used a high-pressure water gun to clean

production machinery. She operated the gun by pulling a trigger with all the fingers of one hand at the same time. She used her right hand until it began to trouble her, then switched to the left. Eventually, she also experienced trouble with her left hand.

In October 1992, the plant nurse arranged an appointment for Martin with Dr. G. Edward Chappell, Jr., an orthopedic surgeon. On October 19, 1992, the doctor diagnosed Martin as suffering from carpal tunnel syndrome in both hands, a consequence, he stated, of "doing repetitive work on the poultry line at Perdue." In his final report, the doctor opined that Martin's carpal tunnel syndrome "is a disease caused by her employment at Perdue -- specifically on a poultry line."

Deputy Commissioner Herring held that Martin had "failed to meet her burden of proof that she suffers from a disease" and that "no award shall enter." The full Commission reversed and awarded compensation to Martin, holding that Dr. Chappell had "identified her condition as a disease" and that the Commission had "consistently held that a disease caused by repetitive motion or trauma is compensable as an occupational disease when supported, as here, by the medical record."

### Wampler-Longacre v. Biller

Shirley A. Biller (Biller) began working for Wampler-Longacre Chicken, Inc. (Wampler-Longacre) on February 3, 1993, in the "Rehang" department of its processing plant in Broadway. Her job required her to use both hands to take chickens from a rotating belt and place them on "shackles" above

her.  In this process, her thumbs were "in an upward position."
On average, she handled between 25 and 30 birds each minute
during an eight-hour shift, with two one-half hour breaks.

On November 29, 1993, Biller reported to Dr. Galen G. Craun,
Jr., a Harrisonburg physician, who found that her thumbs were
"locked in extension."  The doctor told Biller she had "trigger
thumbs," and he diagnosed her as suffering from tenosynovitis.
He testified in a deposition submitted to the Commission that
while there are a number of causes of "trigger thumb," he was of
opinion that Biller's tenosynovitis was "the accumulation or the
product of many repetitious minor injuries to a joint, in the
case here of the thumbs."  The doctor also said that he
considered "trigger thumb a disease."

Deputy Commissioner Herring held that Biller had "failed to
meet her burden of proof that she suffers from a compensable
disease" and that "no award shall issue."  The full Commission
reversed, pointing out that subsequent to the time the deputy
commissioner decided the matter, the Commission had held in
another case that "'cumulative trauma which causes or results in
a disease may be compensable.'"  The Commission awarded
compensation to Biller, citing Dr. Craun's opinion that Biller's
"trigger thumb" was a disease and that it was "caused by work
repetition."

In an unpublished opinion issued in each case, the Court of
Appeals affirmed the Commission's action, holding that the
impairment suffered by the particular employee constituted an
occupational disease.  Finding that the cases involve matters of

significant precedential value, Code § 17-116.07(A)(2) and (B),
we awarded appeals to Stenrich, Perdue, and Wampler-Longacre.

In reviewing the cases, the Court of Appeals treated as
findings of fact the Commission's holdings that the impairments
suffered by the three employees were diseases within the
contemplation of the Act.  The court then undertook a limited
appellate review, inquiring only whether the findings were
supported by credible evidence.  Finding there was such support,
the Court of Appeals upheld the Commission's awards.

We disagree with the Court of Appeals.  Admittedly, an award
of the Commission is "conclusive and binding as to all questions
of fact."  Code § 65.2-706(A); see City of Richmond v. Braxton,
230 Va. 161, 163, 335 S.E.2d 259, 261 (1985).  However, we think
the issue whether a worker has suffered an impairment that
constitutes a compensable disease is a mixed question of law and
fact and, hence, a Commission finding on the question is not
conclusive and binding upon this Court but is properly subject to
judicial review.  See Braxton, 230 Va. at 163-64, 335 S.E.2d at
261 (mixed question of law and fact, properly reviewable, whether
injury arose out of and in the course of employment); see also
Nichols v. VVKR, Inc., 241 Va. 516, 519, 403 S.E.2d 698, 700
(1991) (mixed question of law and fact whether worker's actions
constituted part of owner's trade, business, or occupation);
VEPCO v. Kremposky, 227 Va. 265, 270, 315 S.E.2d 231, 234 (1984)
(mixed question of law and fact whether safety rule strictly
enforced); Derby v. Swift & Co., 188 Va. 336, 344, 49 S.E.2d 417,
421 (1948) (mixed question of law and fact whether worker

suffered an accident).

Here, the factual part of the mixed question is whether the three claimants involved have suffered impairments, and there can be no doubt that they have; the evidence conclusively establishes that Jemmott and Martin suffer from carpal tunnel syndrome and that Biller suffers from "trigger thumbs." The legal part of the mixed question is whether these impairments, which all parties agree were gradually incurred, constitute diseases within the contemplation of the Act. In resolving this part of the question, the crucial inquiry is whether the Commission correctly applied the law to the established facts. See Cinnamon v. International Business Machs. Corp., 238 Va. 471, 474, 384 S.E.2d 618, 619 (1989).

As first enacted in 1918, what is now the Workers' Compensation Act provided compensation only for injury by accident arising out of and in the course of employment. Compensation for disease "in any form" was excluded except "where it results naturally and unavoidably from the accident." Acts 1918, c. 400, § 2(d).

We first dealt with the question of a gradually incurred injury in Aistrop v. Blue Diamond Coal Co., 181 Va. 287, 24 S.E.2d 546 (1943). In Aistrop, we said that "'injury of gradual growth, . . . caused by the cumulative effect of many acts done or many exposures to conditions prevalent in the work, no one of which can be identified as the cause of the harm, is definitely excluded from compensation.'" Id. at 293, 24 S.E.2d at 548 (quoting Francis H. Bohlen, A Problem in the Drafting of

Workmen's Compensation Acts, 25 Harv. L. Rev. 328, 343 (1912)).

The year after our decision in Aistrop, the General Assembly added "a carefully limited coverage for occupational diseases." Morris v. Morris, 238 Va. 578, 584, 385 S.E.2d 858, 862 (1989); Acts 1944, c. 77, § 2-f.  Present Code §§ 65.2-101 and -400 reflect the additional coverage provided by the 1944 legislation.

> **§ 65.2-101.  Definitions**.-- As used in this title:
>
>     . . . .
>
> "Injury" means only injury by accident arising out of and in the course of the employment or occupational disease as defined in [§§ 65.2-400 to -407] of this title and does not include a disease in any form, except when it results naturally and unavoidably from either of the foregoing causes.[1]
>
> **§ 65.2-400.  "Occupational Disease" defined.--** A.  As used in this title, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment.
>
>     B.  A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:
>     1.  A direct causal connection between the conditions  under which work is performed and the occupational disease;
>     2.  It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

---

[1]Appellee Martin argues that the language of § 65.2-101 which states that "'[i]njury' . . . does not include a disease in any form, except when it results naturally and unavoidably from either of the foregoing causes" means that "a disease in any form is compensable as an 'injury' when it results naturally and unavoidably from either an injury by accident or an occupational disease."  However, the language, "'[i]njury' . . . does not include a disease in any form," as used in the statute, is language of limitation, and to give it the meaning Martin proposes would turn it on its head.

3. It can be fairly traced to the employment as the proximate cause;

4. It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column;

5. It is incidental to the character of the business and not independent of the relation of employer and employee; and

6. It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

Despite our holding in Aistrop that gradually incurred injuries are not compensable and notwithstanding the coverage added in 1944 for occupational diseases, claims coming before this Court for gradually incurred impairments continued for many years to be asserted only upon the injury-by-accident basis for compensation. Then, in Holly Farms v. Yancey, 228 Va. 337, 321 S.E.2d 298 (1984), we were presented the question "whether a lumbosacral strain of gradual development is an occupational disease." Id. at 338, 321 S.E.2d at 299. Reversing an award of compensation in favor of the claimant based upon a finding by the Commission that the claimant suffered from an occupational disease, we noted that this Court consistently had held that a back strain is an injury, not a disease. Id. at 340, 321 S.E.2d at 300. Yet, we said, the claimant "urges us to adopt a broad definition of disease which would encompass virtually anything that goes wrong with the body." Id. Noting that compensation is allowed "where there has either been an accidental injury or an occupational disease," id., we said:

A definition of either "injury" or "disease" that is so broad as to encompass any bodily ailment of whatever origin is too broad because it would make unnecessary and meaningless the two categories specifically set

forth in the Act. For more than 50 years, back pains such as those complained of by [the claimant] have been treated in our cases as injuries, not as diseases. If this distinction is to be done away with, the legislature must do so.

228 Va. at 340-41, 321 S.E.2d at 300.[2]

Holly Farms was followed by Western Electric Co. v. Gilliam, 229 Va. 245, 329 S.E.2d 13 (1985). There, the claimant was diagnosed by her physician as suffering from tenosynovitis in both hands, "'due to an overuse type of syndrome . . . related to the repetitive motions involved in her job.'" Id. at 246, 329 S.E.2d at 14. The Commission awarded the claimant compensation for an occupational disease. While accepting the Commission's finding that tenosynovitis is a disease, this Court reversed, holding that the claimant suffered from an ordinary disease of life that did not fall within one of the two exceptions then contained in Code § 65.1-46 (now part of § 65.2-401) and, hence, was not compensable. Id. at 247, 329 S.E.2d at 14.[3] We also

_____

[2]Appellee Martin states that after this Court decided Holly Farms, the General Assembly "codified the Court's judicially created exclusion of back strains from consideration as a disease" by amending Code § 65.2-400(B)(4) to exclude from the definition of occupational diseases "any condition of the neck, back or spinal column." Martin then argues that the General Assembly knew that this Court uses the rule expressio unius est exclusio alterius in construing statutes and that "by excluding any condition of the neck, back, or spinal column, the General Assembly knowingly included all other diseases." But the exclusion is contained in the portion of § 65.2-400 which lists the six factors necessary to establish causal connection between disease and work place, not in the portion relating to coverage. With this placement, the General Assembly could not possibly have intended the amendment to have the sweeping effect Martin would have us give it.

[3]At the time Holly Farms was decided, § 65.1-46 (now part of § 65.2-401) provided coverage for an ordinary disease of life provided (1) it followed "as an incident of

said in <u>Western Electric</u> that our decision was based, "as it was

in <u>Holly Farms</u>, upon our interpretation of legislative intent as

reflected in the totality of the Workers' Compensation Act <u>as it</u>

<u>exists today</u>."  <u>Id.</u>  We then stated:

> Some contend that any disability arising out of and
> during the course of employment, <u>including disabilities</u>
> <u>resulting from both injuries and diseases caused</u>
> <u>gradually by repeated trauma</u>, should be made
> compensable under the Workers' Compensation Act.  But
> such a consequential decision, impacting as it must a
> broad spectrum of economic and social values, is a
> matter of public policy reserved to the original and
> exclusive jurisdiction of the General Assembly, and we
> will not trespass upon its domain.

<u>Id.</u> at 247-48, 329 S.E.2d at 14-15 (emphasis added) (footnote

omitted).[4]

We next considered a gradually incurred impairment in

<u>Merillat Industries, Inc. v. Parks</u>, 246 Va. 429, 436 S.E.2d 600

(1993).  There, the Commission awarded the claimant compensation

based upon a finding of occupational disease for a torn rotator

cuff muscle caused by repetitive overhead lifting and

manipulation of the left arm.  The Court of Appeals upheld the
(..continued)
occupational disease as defined in [Title 65.1]," or (2) it
was "an infectious or contagious disease contracted in the
course of [one's] employment" in certain health-related
occupations.  A third proviso was added in 1986.  <u>See</u> note
4.

[4]Appellee Martin argues that "in answer to the obstacle
to compensation found in <u>Western Electric</u>, [the General
Assembly added a] third class of ordinary diseases of life
that are compensable if . . . 'characteristic of the
employment and . . . caused by conditions peculiar to such
employment.'"  Code § 65.1-46.1(3) (now Code § 65.2-401(3)).
 Martin says this amendment "would make [the] claim in
<u>Western Electric</u> compensable."  We will not speculate,
however, on what might have been the outcome of <u>Western</u>
<u>Electric</u> had the amendment been in effect at the time of our
decision.

award.  Merillat Indus., Inc. v. Parks, 15 Va. App. 44, 53, 421 S.E.2d 867, 872 (1992).

Reversing the judgment of the Court of Appeals and entering final judgment for the employer, we said that Code § 65.1-46 (now § 65.2-400), relating to occupational diseases, "requires that the condition for which compensation is sought as an occupational disease must first qualify as a disease."  246 Va. at 432, 436 S.E.2d at 601.  However, we said, neither the Commission nor the Court of Appeals determined whether the claimant's rotator cuff tear was a disease but, rather, found the tear compensable as an occupational disease because there was a causal connection between the tear and the work place by applying the six factors listed in Code § 65.1-46 (now § 65.2-400).  This causality analysis, standing alone, we stated, does not comply with the requirements of the Act for determining compensability of an impairment and, furthermore, would permit the allowance of compensation for any ailment as an occupational disease "as long as it is shown to be causally connected to the work place by meeting the six factors set out in § 65.1-46 [now § 65.2-400]." Id.

As we had done in previous cases, we pointed out that the categories of compensable impairments created by the legislature -- accidental injury and occupational disease -- "are separate, meaningful categories."  Id. at 433, 421 S.E.2d at 602.  We repeated the Holly Farms admonition that a definition of either injury or disease that is so broad that it would encompass any bodily ailment of whatever origin "'is too broad because it would

make unnecessary and meaningless the two categories specifically set forth in the Act.'"  Id.  And we reasserted our position that "'[i]f this distinction is to be done away with, the legislature must do so.'"  Id.

Finally, we noted that "[t]he General Assembly still has not altered the categories of injuries and diseases nor has it substituted a single test of causality," and we stated that "[w]e again decline to do so."  Id.  Accordingly, because the claimant had failed to first qualify her impairment as a disease, we held that the rotator cuff tear suffered by the claimant "must be classified as an injury, not a disease."  Id.

On the same day we decided Merillat, we also decided, by an order published at 438 S.E.2d 768, the case of TAD Technical Services Corp. v. Fletcher.  In our order, we said that for the reasons stated in Merillat, "the Court of Appeals erred in holding that a torn rotator cuff muscle is compensable as an occupational disease," and we reversed the judgment of the Court of Appeals and entered final judgment in favor of the employer. Id. at 769.

We thought we had made it plain in Holly Farms and Merillat that any definition of the words "injury" and "disease" that is so broad as to encompass any bodily ailment of whatever origin is too broad.  Yet, hardly had the ink dried on the Merillat opinion before the Court of Appeals decided Piedmont Manufacturing Co. v. East, 17 Va. App. 499, 438 S.E.2d 769 (1993).  There, the claimant suffered from tenosynovitis, causing severe pain in her left hand.  Her work involved the repetitive use of her left hand

to inspect and handle small components.  Claimant sought compensation for an occupational disease.  Her doctor described her condition as "'secondary to overuse syndrome or repetitive trauma syndrome.'"  Id. at 502, 438 S.E.2d at 771.  The Commission awarded the claimant compensation for an occupational disease, and the Court of Appeals affirmed.  In deciding that the claimant suffered from an occupational disease, the Court of Appeals adopted the following definition of the word "disease," taken from The Sloane-Dorland Annotated Medical-Legal Dictionary 209 (1987):

> [A]ny deviation from or interruption of the normal structure or function of any part, organ, or system (or combination thereof) of the body that is manifested by a characteristic set of symptoms and signs whose etiology, pathology, and prognosis may be known or unknown.

17 Va. App. at 503, 438 S.E.2d at 772.

In each of the present cases, the Court of Appeals held that because the physician stated the particular impairment involved was a "disease," the statement satisfied the definition of "disease" enunciated in Piedmont.  But just because a doctor opines that a particular impairment is a disease does not necessarily make it so.  As indicated earlier in this opinion, whether a claimant suffers from a disease within the contemplation of the Act is a mixed question of law and fact, and whether a proper definition has been used to test the authenticity of a doctor's opinion is strictly a legal question.

Clearly, the Piedmont definition "is contrary to the mandate of Merillat," Perdue Farms, Inc. v. McCutchan, 21 Va. App. 65,

77, 461 S.E.2d 431, 437 (1995) (Koontz, J., dissenting), because it "'is so broad as to encompass any bodily ailment of whatever origin [and] would make unnecessary and meaningless the two categories specifically set forth in the Act,'" Merillat, 246 Va. at 433, 436 S.E.2d at 602 (quoting Holly Farms, 228 Va. at 340, 321 S.E.2d at 300).

While the doctors involved in these cases opined that the particular impairments suffered by the claimants were diseases, they also said that the impairments resulted from cumulative trauma caused by repetitive motion. Because an improper definition of disease was used for testing the authenticity of the medical opinions, the opinions can provide no support for the finding of the Commission and the Court of Appeals that the present claimants suffered from diseases. Therefore, with respect to each claimant, we are left with an impairment resulting from cumulative trauma caused by repetitive motion, an impairment which must be classified as an injury, not a disease, and which, under Merillat, is not compensable.[5]

Appellee Jemmott argues, however, that we did not hold in Merillat that a "condition such as a torn rotator cuff which is clearly caused by cumulative trauma cannot be compensable." Jemmott points to a statement in the Merillat opinion that "for a rotator cuff tear to be compensable under the Act as an

_____

[5]Because we find that the impairments involved here are injuries, not diseases, we do not consider the further contention made by appellees Jemmott and Martin that they are entitled to compensation under Code § 65.2-401 for an ordinary disease of life.

occupational disease, the record must support a finding that the tear is a disease." 246 Va. at 433, 436 S.E.2d at 602. Jemmott also points to a statement that "[b]ased on this record, the rotator cuff tear suffered by Parks must be classified as an injury, not a disease." Id. Jemmott then states as follows: "This Court merely stated in Merillat that in that case, with that record, where there was no medical evidence to support a finding that the rotator cuff tear was a disease and not an injury, the claimant's rotator cuff tear was . . . not compensable."[6]

However, Jemmott's analysis of the extent of our holding in Merillat overlooks the fact that the opinion represents a clear refusal "to broaden the scope of the Act to include job-related impairments arising from repetitive motion or cumulative trauma." 246 Va. at 433, 436 S.E.2d at 601-02. Jemmott's analysis also overlooks the statement in the opinion that "[i]n Morris, we held that gradually incurred traumatic injuries or cumulative trauma conditions were not compensable under the existing injury by accident-occupational disease dichotomy." Id. at 433, 436 S.E.2d at 602. (Emphasis added.)

Jemmott is mistaken about the effect of the statements to which she points in the Merillat opinion. The statements were made merely to demonstrate the failure of the record to show satisfaction of the requirement that "the condition for which compensation is sought as an occupational disease must first

---

[6]Appellee Biller makes a somewhat similar argument.

qualify as a disease."  <u>Id.</u> at 432, 436 S.E.2d at 601.

But if there lingers any doubt about this Court's holding in <u>Merillat</u>, we now remove the doubt by saying that job-related impairments resulting from cumulative trauma caused by repetitive motion, however labeled or however defined, are, as a matter of law, not compensable under the present provisions of the Act. Accordingly, we will reverse each of the judgments under review, dismiss each claim for benefits, and enter final judgment in favor of each employer.

<u>Record No. 950829 - Reversed and final judgment</u>.
<u>Record No. 951050 - Reversed and final judgment</u>.
<u>Record No. 951072 - Reversed and final judgment</u>.